UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONELLA HERNANDEZ, et al., Plaintiffs, v. WILLIAM MAYORGA, et al., Defendants. | Case No. 16-cv-00637-DMR<br><br>**ORDER ON PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT**<br><br>Re: Dkt. No. 73 |

Plaintiffs Antonella Hernandez, Silvia Flores, Evelin Lopez, Yanira Mendoza, Victoria Tercero, Nidia Tercero, and Alicia Vega ("Plaintiffs") are current and former bartenders and waitresses employed by Defendants Club Mix 26, William Mayorga, Jose Richard Vallejo, and David Gonzalez ("Defendants"). On February 8, 2016, Plaintiffs filed this action alleging claims for sexual harassment, retaliation, battery, unlawful business practices, wrongful discharge, and numerous wage-and-hour violations. Complaint ("Compl.") [Docket No. 1]. In May 2017, the parties executed a settlement agreement ("Settlement Agreement") providing for monetary compensation and injunctive relief. The court retained jurisdiction to enforce the Settlement Agreement. [Docket No. 70].

Before the court is Plaintiffs' motion to enforce the Settlement Agreement. [Docket No. 73]. Plaintiffs contend that Defendants have failed to comply with numerous provisions of the Settlement Agreement, including restoring Plaintiff Nidia Tercero ("Tercero") to her former position, hours and schedule, and ending unlawful employment practices and policies that apply to Club 26 Mix ("the Club") employees. These include requiring Club employees to pay a $5 per shift "cleaning fee," reimburse the Club for routine cash shortages or overages, and pay for unpaid customer drinks. Plaintiffs seek Defendants' compliance, payment of $4,479.30 in lost wages to Tercero, and award of attorneys' fees and costs pursuant to the terms of the Settlement Agreement.

Defendants oppose, asserting that they have substantially complied with the Settlement Agreement. [Docket No. 76].

The court held a hearing on March 15, 2018. Having considered the parties' submissions and arguments, and for the reasons stated below, the court grants Plaintiffs' motion in part and denies it in part.

## I. BACKGROUND

On May 10, 2017, the parties executed the Settlement Agreement, in which Defendants agreed to pay $275,000.00 to Plaintiffs and their counsel; to restore Tercero to her pre-lawsuit position, hours, and schedule; and to make changes to the Club's policies and practices. Settlement Agreement (Ex. A to Declaration of Nidia Tercero ("Tercero Decl.")) [Docket No. 73-4]. Relevant to this motion, Defendants agreed to complete certain contractual obligations by deadlines specified in the Settlement Agreement:[1]

- By May 15, 2017, Defendants agreed to restore Tercero to the position, hours, and schedule she held prior to the filing of the complaint in this action, and to pay her sick leave for the period March 26 to March 28, 2017. Settlement Agreement, Section 1.17.
- By May 20, 2017, Defendants agreed to begin collecting, maintaining, and furnishing employment documents and records compliant with California law including California Labor Code §§ 226 and 1174.[2] *Id.*, Section 1.20.
- By June 9, 2017, Defendants agreed to (1) revise wage and hour, dress code, and

---

[1] The deadlines set forth in this order have been calculated pursuant to the Settlement Agreement by running them from its May 10, 2017 effective date.

[2] Section 226 requires, among other things, that every employer furnish an accurate itemized wage statement to each of its employees "either as a detachable part of the check, draft, or voucher paying the employee's wages, or separately when wages are paid by personal check or cash," that shows such information as "the inclusive dates of the period for which the employee is paid" and "the name and address of the legal entity that is the employer." Cal. Labor Code §§ 226(a)(6) & (a)(8).

Section 1174 requires employers to maintain accurate payroll record for its employees. Cal. Lab. Code § 1174(d).

2

1  sick leave policies in conformity with the applicable law, and replace the current
2  dress code and replace it with one that confirms with the law; (2) install individual
3  lockers for each employee to keep his or her belongings at Club at no charge to the
4  employee; and (3) eliminate the unlawful employment policies and practices
5  challenged by Plaintiffs in this action. Settlement Agreement, Sections 1.9, 1.12,
6  1.13. These unlawful employment policies and practices include requiring
7  employees to work an unpaid "training period" at the beginning of their
8  employment, pay a $5 per shift "cleaning fee," reimburse the Club for routine cash
9  register shortages or overages, bear the cost of the customers' unpaid drinks,
10  purchase work attire for which they were not reimbursed, and pay for unsold
11  tickets. *Id.*, Section 1.13.

12  Defendants also agreed to the appointment of a mutually selected Independent Monitor, who would assess the Club's compliance with the Settlement Agreement through unannounced site visits. *Id*., Section 1.5.

15  On May 10, 2017, the parties moved for approval of the Settlement Agreement as required by PAGA, *see* Cal. Labor Code §§ 2699(l)(2) and 2699.3(b)(4), and also requested that the court retain jurisdiction to enforce the settlement. [Docket No. 62]. The court approved the Settlement Agreement on May 30, 2017, and agreed to retain "jurisdiction until June 30, 2019 or until the terms of the Settlement Agreement are fully performed, whichever occurs first." Order Granting Approval of Settlement and Retaining Jurisdiction over Settlement at 2 [Docket No. 70].

21  On January 25, 2018, Plaintiffs filed this motion to enforce the Settlement Agreement. [Docket No. 73]. According to Plaintiffs, Defendants have not complied with numerous provisions of the Settlement Agreement. For example, according to Tercero, she still has not been restored to her pre-complaint position, hours, and schedule; has cleaning and maintenance duties that she did not previously have; is still required to wear a skirt or shorts; and must still bring her own money to pay for the customers' unpaid drinks. Declaration of Tercero ("Tercero Decl.), ¶¶ 8-13, 17 [Docket No. 73-3]. Additionally, Independent Monitor Citlalli Ochoa observed at a December 2017 site visit that employees were still being required to pay a $5 fee for the "busboy"

3

during their shifts, reimburse the Club for routine cash shortages, bear the costs of the customers' unpaid drinks, and wear skirt or shorts. Monitoring Report- December 2017, Section 1.13 (Ex. O) to the Declaration of Julia Parish ("Parish Decl.") [Docket No. 73-2]. Accordingly, Plaintiffs seek an order compelling Defendants' compliance with Sections 1.9 (dress code); 1.12 (lockers); 1.13 (policies and practices); 1.14 (sick leave); 1.17 (Tercero's position, hours and schedule); and 1.20 (employee personnel files) of the Settlement Agreement. Plaintiffs also request a payment of $4,479.30 to Tercero in lost wages due to Defendants' non-compliance with Section 1.17, and an award of reasonable attorneys' fees and costs incurred in enforcing the Settlement Agreement pursuant to Section 7.1 (attorneys' fees and costs).

## II. LEGAL STANDARD

The parties do not dispute that the court has jurisdiction to enforce the Settlement Agreement. *See* Order Approving Settlement Agreement and Retaining Jurisdiction; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 380-81 (1994) (explaining that a court has ancillary jurisdiction to enforce a settlement agreement when the parties agree to continuing or retention jurisdiction).

A "motion to enforce [a] settlement agreement essentially is an action to specifically enforce a contract," and "[a]n action for specific performance without a claim for damages is purely equitable and historically has always been tried to the court." *Adams v. Johns–Manville Corp.*, 876 F.2d 702, 709 (9th Cir. 1989) (citation and internal quotations marks omitted). Thus, "the court may hear evidence and make factual determinations." *Fair Hous. Council of Cent. Cal., Inc. v. Tylar Prop. Mgmt. Co.*, 975 F. Supp. 2d 1115, 1118 (E.D. Cal. 2012) (citing *Stewart v. M.D.F., Inc.*, 83 F.3d 247, 251 (8th Cir. 1996)). A court may order compliance with a settlement agreement in light of evidence of a party's non-compliance. *See, e.g., Fisher v. Biozone Pharm., Inc.*, No. 12-CV-03716-LB, 2017 WL 1097198, at *1 (N.D. Cal. Mar. 23, 2017) (prohibiting the plaintiff from "making any further disparaging comments about the defendants" in violation of the settlement agreement's non-disparagement term, and ordering the plaintiff to fully comply with the "settlement agreement's non-disparagement term").

"The interpretation of a settlement agreement is governed by principles of state contract

4

1  law." *Botefur v. City of Eagle Point, Or.*, 7 F.3d 152, 156 (9th Cir. 1993) (citing *Jeff D. v. Andrus*, 899 F.2d 753, 759 (9th Cir. 1990)). "This is so even where a federal cause of action is 'settled' or 'released.'" *Id.* (citing *United Commercial Ins. Serv., Inc. v. Paymaster Corp.*, 962 F.2d 853, 856 (9th Cir. 1992)). Here, California contract law governs the analysis because the parties litigated and settled the case in this state. "Under California law, the goal of contractual interpretation is to give effect to the mutual intention of the parties." *Ambat v. City & Cty. of San Francisco*, No. C 07-03622 SI, 2011 WL 2118576, at *2 (N.D. Cal. May 27, 2011) (citing *Bank of the W. v. Superior Court*, 2 Cal. 4th 1254, 1264 (1992)). "The mutual intention of the parties is determined by examining factors including the words used in the agreement, the surrounding circumstances under which the parties negotiated or entered into the contract, and the subsequent conduct of the parties." *Ambat*, 2011 WL 2118576, at *2 (citing *Morey v. Vannucci*, 64 Cal. App. 4th 904, 912 (Ct. App. 1998); *Hernandez v. Badger Constr. Equip. Co.*, 28 Cal. App. 4th 1791, 1814 (Ct. App. 1994)).

## III. DISCUSSION

According to Plaintiffs, Defendants have failed to comply with the following provisions of the Settlement Agreement: 1.9 (dress code); 1.12 (lockers); 1.13 (policies and practices); 1.14 (sick leave); 1.17 (Tercero's position, hours and schedule); and 1.20 (employee personnel files). Defendants do not dispute that they have failed to timely comply with these provisions. Instead, they ask the court to credit them for having substantially complied with some of the provisions.

### A. Section 1.9 (Dress Code)

Section 1.9 requires Defendants to "revise [the Club's] wage and hour, dress code, and sick leave policies in conformity with the applicable law and eliminate the current dress code and replace it with one that conforms with the law" by June 9, 2017.

The undisputed evidence shows that as of December 2017, the Club still required all female employees to wear skirts or shorts. Monitoring Report- December 2017, Section 1.13 ("Club 26 continues to require its employees to [wear] skirts or shorts and does not allow them to wear pants."). According to the Independent Monitor's December 2017 site visit report, all the female employees she spoke with "confirmed that this was the Club's uniform policy," and "all

female employees [wore] shorts or skirts during both of [her] visits" to the Club. Monitoring Report-December 2017, Section 1.13; Tercero Decl., ¶ 9 (stating that as January 2018, she still wears skirts or shorts and the "dress code [still] prohibits employees from wearing pants"). There is no evidence indicating that this practice has ceased.

The court finds that Defendants have not complied with Section 1.9, and orders full and immediate compliance with this provision.

**B.     Section 1.12 (Lockers)**

Section 1.12 requires Defendants to "install individual lockers for each employee to keep his or her belongings in a safe and secure manner at no charge to the employee" by June 9, 2017.

The evidence demonstrates that Defendants continued to charge employees a $2 fee to store items in lockers as of December 2017, but that this practice stopped as of January 2018. Monitoring Report-December 2017, Section 1.12, Tecero Decl., ¶ 17; January 2018 e-mail from Ochoa to Katherine Wutchiett and Julia Parish, counsel for Plaintiffs, and Jon Piper, counsel for Defendants, (Ex. R) to Parish Decl. ("January 2018 Ochoa e-mail update") ("Employees are no longer charged to use the lockers."). However, as recently as December 2017, the Club was charging employees to store personal belongings such as backpacks and jackets that did not fit in a locker. Monitoring Report-December 2017, Section 1.12.

Moreover, it is not clear that the Club has provided every employee with a safe and secure place to store belongings as required by Section 1.12, because the parties dispute whether the Club has provided a lock for every employee. Monitoring Report-December 2017, Section 1.12 (explaining that some employees had yet to receive locks for their lockers, but all employees confirmed that they were being charged a fee to store personal belongings such as jackets and backpacks that did not fit in their lockers); January 2018 e-mail Ochoa update ("With regard to who has a lock and who does not, there are still discrepancies between what employees tell me and what [Mayorga] tells me. Some employees tell me that there are still employees that have not received locks, but other employees and [Mayorga] assure me that everyone received a lock.").

Defendants had an opportunity to submit evidence to establish that they have provided locks for *all* employees and have ceased charging any storage fee. Their evidence falls far short of

this. *See* Declaration of William Mayorga ("Mayorga Decl."), ¶¶ 8, 10 [Docket No. 76-1] (stating that the Club had "installed lockers and purchased locks"). Since Defendants failed to provide evidence showing that all employees have locks and are not being charged to store personal belongings at the Club, the court finds that Defendants have not complied with Section 1.12, and orders Defendants to immediately (1) provide each employee with an individual locker and locking device that will keep his or her belongings in a safe and secure manner, and (2) cease the practice of charging employees to store personal belongings.

### C. Section 1.13 (Policies & Practices)

Section 1.13 requires Defendants to eliminate the policies and practices challenged by Plaintiffs in this action by June 9, 2017. Relevant to this motion are the Club's policies of requiring its employees to pay a $5 per shift "cleaning fee," to reimburse the Club for routine cash register shortages or overages, and to pay for customers' unpaid drinks.

The unrebutted evidence shows that the Club still required employees to pay a $5 per shift cleaning fee as of January 2018. Monitoring Report- December 2017, Section 1.13; Tercero Decl., ¶ 16 (as of January 2018, Mayorga, Vallejo, and Carlos Luna still "force other employees to pay a $5 cleaning fee for every shift that they work"). Although the Independent Monitor's January 2018 e-mail states that "Mayorga instructed employees that they are no longer required to pay the $5 shift fee," that same email notes that the Independent Monitor was still waiting to receive a copy of the email that Mayorga says he sent to employees on this topic. Again, Defendants had a full opportunity to provide proof that this practice has stopped. They have not done so. For this reason, the court is not persuaded that the Club's employees are no longer being charged a cleaning fee. Accordingly, the court finds that Defendants have not complied with Section 1.13 and orders them to immediately eliminate the $5 per shift "cleaning fee."

Unrebutted evidence also demonstrates that as of December 2017, the Club still required its employees to reimburse the Club for routine cash register shortages. Monitoring Report- December 2017, Section 1.13. There is no evidence indicating that this practice has ceased. Accordingly, the court finds that Defendants have not complied with Section 1.13, and orders them to immediately stop requiring employees to reimburse the Club for routine cash register

7

shortages.

The evidence does establish that the Club has ceased its practice of requiring its employees to pay for customers' unpaid drinks. According to Mayorga's Declaration, which was signed under penalty of perjury on February 7, 2018, the Club has "stopped requiring [its] employees [to] bear the cost for unpaid drinks." Mayorga Decl., ¶ 8. At the hearing, Plaintiff's counsel did not present any evidence that this practice is ongoing. Accordingly, based on Mayorga's representation and the absence of contrary evidence, the court concludes that Defendants have ceased requiring their employees to pay for customers' unpaid drinks, and that they are in compliance with Section 1.13 as to this practice.

### D. Section 1.17 (Tercero's Position, Hours, and Schedule)

Section 1.17 requires Defendants to return Tercero to the position, hours, and schedule she held prior to the filing of the complaint in this action by May 15, 2017. Section 1.17 specifies that prior to the filing of this lawsuit, Tercero worked approximately 80 hours every two weeks, including Friday nights, primarily as a waitress. Section 1.17 also limits Tercero from working as a bartender to no more than one shift per week, and only when staffing purposes require her to work as a bartender.

Unrebutted evidence demonstrates that Tercero has not worked 80 hours biweekly since May 10, 2017. According to Tercero, her hours fell short of her 80 hours biweekly schedule by the following amounts: May: 50 hours, June: 12 hours; July: 30 hours; August: 46 hours; September: 54 hours; October: 60 hours; November: 34 hours; December: 23 hours; January: 17 hours, for a total of 324 hours. Tercero Decl., ¶ 14; Parish Decl., ¶ 37. Defendants do not dispute that Tercero's biweekly hours fall considerably short of 80 hours every two weeks. Instead, they argue that Tercero is not entitled to 80 hours biweekly because, at most, Tercero previously worked 33 hours per week and, on average, worked 19 hours per week. Mayorga Decl., ¶ 4, Ex. B (Schedules); Deposition of Nidia Tercero ("Tercero Depo.") (Ex. A) at 17:1-23 to the Declaration of Jon Piper ("Piper Decl."). Defendants' response is irrelevant, because the language of Section 1.17 is clear and unambiguous and therefore controls. *See Maggio v. Windward Capital Mgmt. Co.*, 80 Cal. App. 4th 1210, 1215 (Ct. App. 2000) ("If contractual language is clear and explicit, it

governs."); Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). The court therefore will not consider Defendants' "extrinsic evidence" on the issue of Tercero's pre-complaint hours. *See Reilly v. Inquest Tech., Inc.*, 218 Cal. App. 4th 536, 557 (Ct. App. 2013) ("[E]xtrinsic evidence is not relevant when the contract appears unambiguous on its face."). Accordingly, the court finds that Defendants have not complied with Section 1.17 and orders Defendants immediately to restore Tercero to a schedule of approximately 80 hours every two weeks.

As for the period of time from May 2017 to January 2017 during which Tercero should have worked 80 hours every two weeks pursuant to the terms of the contract, the court finds that it is appropriate to award Tercero lost wages. The court cannot order specific performance as to that time period, because it has already passed. *Barndt v. Cty. of Los Angeles*, 211 Cal. App. 3d 397, 404 (Ct. App. 1989) (In lieu of specific performance of a personal service contract, such as an employment contract, the remedy for "breach of a personal service contract is an action for damages."). Accordingly, damages are the only means left to compensate Tercero for Defendants' past noncompliance with Section 1.17. *See, e.g., Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 575-79 (Ct. App. 1983) (finding that plaintiff was entitled to damages for past breaches of the agreement, in addition to specific performance).

In a breach of contract action, "the measure of damages . . . is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300. Accordingly, "California case law has long held" that "[d]amages are awarded in an action for breach of contract to give the injured party the benefit of his bargain and insofar as possible to place him in the same position he would have been in had the promisor performed the contract." *Martin v. U-Haul Co. of Fresno*, 204 Cal. App. 3d 396, 409 (Ct. App. 1988) (citation and internal quotation marks omitted).

Here, the appropriate measure of damages for Defendants' past noncompliance with Section 1.17 is the difference in the value of the wages for the hours Tercero worked and the hours she was entitled to work under the contract. Plaintiffs request lost wages for Tercero in the

9

amount of $4,479.30, which appears to break down as follows: 324 hours (the total number of hours that Tercero was owed from May 2017 to January 2018) x $13.83 (Tercero's approximate average hourly rate through that time period). Parish Decl., ¶ 37; Tercero Decl., ¶ 14. At the hearing, Defendants confirmed that they do not dispute these figures. Accordingly, the court awards Tercero lost wages in the amount of $4,479.30.

With respect to Tercero's schedule, Tercero states that she has not worked a 6 p.m. to 2 a.m. shift as a night-shift waitress, which is the shift she used to work 5 days a week prior to this lawsuit. Tercero Decl., ¶¶ 4, 8. Instead, she has worked an irregular schedule, consisting mostly of day shifts, during which she receives fewer tips and is regularly sent home early. *Id.*, ¶¶ 9, 13; Monitoring Report- December 2017, Section 1.17. Furthermore, according to Tercero, when she is scheduled for night shifts, they are only four hours long and consist of her collecting the cover charge to enter the Club for which she does not receive tips. *Id.*, ¶¶ 11, 13. Defendants do not provide any evidence to rebut Tercero's evidence that she worked 5 night shifts a week prior to the filing of this lawsuit. Instead, they simply argue that the Settlement Agreement does not specify that they must schedule her for night shifts. This argument is unpersuasive. Section 1.17 requires Defendants to restore Tercero to her pre-lawsuit schedule. The unrebutted evidence shows that her pre-lawsuit schedule consisted of 5 night shifts a week as a waitress. Accordingly, the court finds that Defendants have not complied with Section 1.17 and orders Defendants to restore Tercero to the night-shift waitressing schedule that she worked prior to filing the lawsuit.

Tercero also argues that her job duties are different from those that she had before the lawsuit. She offers evidence that she has been assigned to perform maintenance and cleaning duties that she did not previously perform, including scraping gum off of surfaces, washing the sidewalk, and washing the windows outside of the Club. Tercero Decl., ¶¶ 9, 11; Monitoring Report- December 2017 at 3.

The Settlement Agreement does not specify the job duties she should perform. Section 1.17 only requires that Tercero be restored to her previous "position," which the court interprets to mean job title, i.e., waitress. Since there is no evidence that Tercero is not working as a waitress, the court declines to find that Defendants have not complied with Section 1.17 by giving her

different job duties within her position as a waitress.

Although Tercero has been working as a waitress, the unrebutted evidentiary record establishes that she has been assigned to duties that she did not have before. There is also evidence that other employees view the change in Tercero's job duties as a punishment for complaining about the Club's working conditions. Indeed, employees apparently have been deterred from complaining about unlawful employment practices because they fear that they will be subject to the same treatment as Tercero, such as reduced hours and undesirable job duties. Monitoring Report-December 2017, Section 1.17 and Additional concerns at p.3. At the hearing, the court expressed its concern that this behavior may expose Defendants to liability for retaliation. The court strongly suggests that Defendants' attorney counsel Defendants on this matter immediately.[3]

### E. Sections 1.14 and 1.17 (Sick Pay - Tercero and Other Club Employees)

Section 1.14 requires Defendants to ensure that "employees are paid for sick leave in compliance with applicable law" by June 9, 2017. Section 1.17 requires Defendants to provide Tercero with sick pay for March 26 through March 28, 2017 by May 15, 2017.

The evidence demonstrates that Defendants paid Tercero for sick leave on February 2, 2018, and have now complied with Section 1.17 in that regard. Mayorga Decl.,¶ 7. However, the evidence also shows that as of December 2017, Defendants still have not paid sick leave to other Club employees, and that employees are afraid to report the unpaid sick leave because of Defendants' treatment of Tercero in the form of reduced hours and the addition of undesirable job duties. Monitoring Report - December 2017, Section 1.14 (conversations with the Club's employees "revealed that employees failed to ask for/report unpaid sick leave for fear of retaliation" and that employees "reported that management's treatment of Nidia Tercero after the initial complaint and settlement often prevents them from reporting any issues that they have,

---

[3] The court also notes that as recently as February 7, 2018, Mayorga improperly requested that Ochoa provide him with the names of the employees she was in contact with at the Club. February 8, 2018 e-mail from Ochoa to counsel for Plaintiffs (Ex. A) to Parish Reply Decl. [Docket No. 77-2]. This request also raises the court's concern about potential retaliation and deterrence.

11

including any issue regarding their paid sick leave time."). Defendants offered no evidence to suggest that this practice has ceased, and that employees have received sick pay. Accordingly, the court finds that Defendants have not complied with Section 1.14 and orders Defendants to immediately and fully comply with Section 1.14.

### F. Section 1.20 and Section 1.9 (Employee Personnel Files and Access)

Section 1.20 requires that by May 20, 2017, Defendants must begin "collecting, maintaining, and furnishing to all employees employment documents and records as required by California law," including California Labor Code §§ 226, 1174. It also provides that "the Independent Monitor shall review [the Club's] personnel files and determine whether all such documents and records have been included and furnished."

Section 1.9 requires Defendants to provide copies of their revised wage and hour, dress code, and sick leave policies to new and current employees and to keep a copy of the signed acknowledgement of receipt of these policies in each new employee's personnel file for a period of no less than 7 years. It also provides that "Independent Monitor . . . review employee personnel files and determine whether the signed acknowledgement has been included."

The unrebutted evidence shows that Defendants have not provided the Independent Monitor with access to the employee files so that she can assess Defendants' compliance with Sections 1.20 and 1.9. *See* Monitoring Report- December 2017, Section 1.20 ("Given that I have not had access to all personnel files, I cannot confirm that [the Club] has collected and maintained all employees' documents and record as required by California, including §§ 226, 1174."); Ochoa January 2018 e-mail update ("I have not seen the [personnel] files because I could not visit the club on Saturday and Tony does not work on Sunday. . . . Based on my conversation with [Mayorga], the files are not fully complete/updated . . . [Mayorga] will let me know when the rest of the files are ready for review."). Moreover, the employment records that Defendants have produced for Tercero suggest that they have not begun the process of maintaining and collecting accurate employment records for the Club's employees, contrary to Mayorga's statement in his declaration. Mayorga Decl., ¶ 10 (stating that the Club "began to maintain proper employment record" in an effort to comply with the Settlement Agreement). In response to six requests by

Plaintiffs' counsel for Tercero's complete personnel file which should have included personnel records and paystubs, *see* Parish Decl., ¶¶ 23, 25-27, 32 and Exs. K-M and Q, Defendants produced only a handful of documents, including Tercero's schedule and partial biweekly pay records from Wells Fargo for 2017. Ex. S to Parish Decl. (bi-weekly pay records); Parish Decl., ¶¶ 32, 34.

In light of this evidence, the court finds that Defendants have not complied with Sections 1.20 and 1.9 and orders Defendants to immediately and fully comply.

### G. Attorneys' Fees and Costs

Section 7.1 provides in relevant part that the parties "agree and understand . . . that in the event that legal proceedings are initiated for the purpose of enforcing or interpreting any term of [the Settlement Agreement], the prevailing party in any such proceeding shall be entitled to an award of reasonable attorneys' fees and costs incurred in bringing or defending such action."

Under California law, "[e]xcept as attorney's fees are specifically provided by statute, the measure and mode of compensation of attorneys . . . is left to the agreement, express or implied, of the parties." Cal. Civ. Proc. Code § 1021. In an action for breach of contract, where the contract "specifically provides [for] attorney's fees and costs," the "court may award attorneys' fees and costs to the prevailing party." Cal. Civ. Code § 1717(a). "[T]he party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract." Cal. Civ. Code § 1717(b)(1).

The court finds that Plaintiffs are entitled to reasonable attorneys' fees and costs pursuant to Section 7.1. Plaintiffs prevailed on nearly every compliance issue that they raised. Moreover, for those provisions where Defendants have established current compliance, it is undisputed that their compliance was not timely, and was likely brought about as a result of Plaintiffs' enforcement motion. It is undisputed that Defendants did not fully comply with certain provisions of the Settlement Agreement until after Plaintiffs filed this motion on January 25, 2018. For example, Defendants did not pay Tercero her sick leave until February 8, 2018. Mayorga Decl., ¶ 7. Plaintiffs' counsel had to go to great lengths to obtain Defendants' compliance with many of the provisions at issue in this motion. For example, the record shows that Plaintiffs' counsel

13

contacted Defendants' counsel no less than 17 times about Defendants' failure to restore Tercero to her pre-complaint position, schedule, and hours and to pay her unpaid sick leave. Parish Decl., ¶¶ 6-17 (May 15, 17, 19, 2017; May 22 and 25, 2017; June 8, 27, and 30, 2017; July 7, 17, and 20, 2017), ¶¶ 19 -23 (August 4 and 11, 2017; September 5 and 28, 2017; October 4, 2017), ¶ 30 (January 10, 2018); *see also* Exs. A through K, P to Parish Decl. Under these circumstances, the court finds that it is appropriate to award Plaintiffs' counsel reasonable attorneys' fees and costs incurred in filing this motion. By May 17, 2018, Plaintiffs' counsel shall file a regularly noticed motion to support the specific fee award that they seek.

## IV. CONCLUSION

The court grants in part and denies in part Plaintiffs' motion. Defendants are ordered to immediately comply with the Settlement Agreement in conformance with this order. In addition, the court finds that Plaintiffs are the prevailing party pursuant to the terms of the Settlement Agreement. Plaintiffs shall file a regularly noticed motion supporting a specific fee award by no later than May 17, 2018. The court also orders Defendants to pay Tercero $4,479.30 in lost wages for the period of May 2017 through January 2018. Defendants must make this payment within 14 days of the date of this order.

**IT IS SO ORDERED.**

Dated: April 26, 2018



Donna M. Ryu
United States Magistrate Judge